IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CAROLYN SOSEBEE,                                                    PLAINTIFF,

V.                              CASE NO. 2:14-CV-02153

PINNACLE FOODS GROUP LLC,
JOHN DOE NO. 1, JOHN DOE NO. 2,
and JOHN DOE NO. 3,                                        DEFENDANTS.

**<u>DEFENDANT'S MEMORANDUM BRIEF</u>**
**<u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

In this action, Plaintiff Carolyn Sosebee, a truck driver, alleges she was injured by a falling metal load-bracing bar while opening the rear driver-side door of a refrigerated cargo trailer. She claims the bar fell, and she was injured, as a result of the negligence of Defendant Pinnacle Foods Group LLC ("Pinnacle"), whose employees loaded the trailer. The "John Doe" Plaintiffs remain unidentified and no Defendant in this action has been served other than Pinnacle.

Plaintiff advances two theories in support of her negligence claim. The first is a standard negligence theory in which she claims the acts or omissions of Pinnacle's loaders resulted in the falling load-bracing bar and her injuries. Pinnacle asserts, however, that it cannot be liable to Plaintiff as a matter of law regardless of any negligence by its loaders because the law absolves a shipper of the consequences of negligent loading where the defect is not latent and not discoverable by reasonable inspection. Plaintiff cannot produce evidence from which a reasonable jury could find without speculation that the bar fell as a result of a latent loading defect she could not have discovered through reasonable inspection. Since she carries the burden of proof on this issue, her standard negligence theory must fail as a matter of law regardless of whether the placement or positioning of the load-bracing bar was negligent.

1

Plaintiff's second theory supporting her negligence claim is the doctrine of *res ipsa loquitor*.  She claims the accident and her injuries would not have occurred but for negligence on the part of Pinnacle.  However, this theory fails for the same reason her standard negligence claim fails; namely, she cannot carry her burden of proving a latent loading defect existed and therefore any negligence on the part of Pinnacle is irrelevant.  Further, even assuming a *res ipsa loquitor* theory was available to Plaintiff, that theory would fail as a matter of law since she cannot show the instrumentality of her injury was exclusively within the control of Pinnacle at all relevant times prior to her injury.  Plaintiff herself had exclusive control over the trailer and the load-bracing bar for the ten or so hours it took her to drive from Arkansas to Georgia immediately prior to her injury, as well as exclusive control over them at the moment the injury occurred.

## I.
## Facts

Pinnacle operates a frozen food processing plant on West 15th Street in Fayetteville, Arkansas (Ex. 2, ¶ 3).  From there, it ships frozen food products to several storage and distribution locations around the country, including Millard Refrigerated Services in McDonough, Georgia, where Plaintiff's injury occurred on March 17, 2011 (Ex. 2, ¶ 4).

On the date her injury occurred (March 17, 2011), Plaintiff worked as an over-the-road truck driver for the trucking firm West Northwest Transportation, Inc. of Mulberry, Arkansas ("West Northwest") (Ex. 1, pp. 28-30).  In 2011, Pinnacle was contracted with West Northwest to transport Pinnacle's products in refrigerated trailers from its Fayetteville plant to Millard Refrigerated Services in McDonough, Georgia (Ex. 2, ¶ 5).  Under the terms of the carriage contract, West Northwest provided the driver and all the equipment required to transport Pinnacle's product, including the tractor, a refrigerated trailer, and two load securement devices

(which were typically load-bracing bars of the type described below) (Ex. 1, p. 33-35; Ex. 2, ¶¶ 5, 6, att. A).

West Northwest dropped its empty trailers in a staging area at Pinnacle's Fayetteville plant and the trailers were loaded solely by employees of Pinnacle (Ex. 2, ¶ 6). The loads going to Millard Refrigerated Services were typically large shrink-wrapped pallets of frozen food products loaded by forklift (Ex. 2, ¶ 7). When a load was completed, the Pinnacle loaders on some occasions applied the load securement devices provided by West Northwest where appropriate and possible, and if the devices were found in sound mechanical condition (Ex. 2, ¶ 8). The load securement device typically provided by West Northwest (and which was the same device as fell on Plaintiff) was a square metal tension bar applied by means of a central latching mechanism that could be manually engaged after placing the ends of the bar against the walls of the trailer or against the floor and ceiling (Ex. 1, pp. 34-35). Engaging the latch extended the ends of the bar forcefully against the trailer, where it were held in place by a combination of tension and friction (Ex. 1, p. 45). The bar was not latched or otherwise mechanically attached to the trailer, which was "slick-walled" on the inside and had no attachment points (Ex. 1, p. 45). Plaintiff testified that "typically" Pinnacle's loaders applied one of these bars horizontally behind the load and the other vertically between floor and ceiling behind the horizontal bar (Ex. 1, pp. 46, 110, 112). Pinnacle's loading employees testified at deposition they did not attach load-bracing bars to loads in a vertical position, but for the purposes of this motion Plaintiff's testimony will be assumed. After Pinnacle's employees loaded and braced the trailer, the doors were closed, a seal was applied, and the trailer was moved back to the staging area to await pick-up by a driver from West Northwest (Ex. 2, ¶ 11; Ex. 3, pp. 7, 17). The trailers were initially

hauled to West Northwest's yard in Mulberry before being picked up by other West Northwest drivers and transported to their ultimate destination (Ex. 1, pp. 33, 38-39).

By the time her injury occurred on March 17, 2011, Plaintiff had driven for West Northwest for approximately seven years, and she had acquired more than twenty years of general over-the-road driving experience for various employers (Ex. 1, pp. 21, 25-26, 28, 30). Also by that time, she had been hauling trailers of Pinnacle product loaded by Pinnacle's loaders from Mulberry to Millard Refrigerated Services for some four to five years, typically twice a week (Ex. 1, pp. 30, 35, 50). She estimated that by March 17, 2011, she had hauled over 500 loads for Pinnacle from Mulberry to Millard Refrigerated Services (Ex. 1, p. 35). Plaintiff was an experienced over-the-road driver who had a great deal of specific experience hauling trailers containing product packaged, loaded, and secured by Pinnacle's Fayetteville loaders.

### The events of March 16, 2011.

The events immediately leading up to the incident that caused Plaintiff's injuries began on March 16, 2011, when West Northwest driver Bob Riley arrived at the Fayetteville plant to hook and pull to West Northwest's Mulberry yard a Pinnacle-loaded trailer containing the load-bracing bar that fell on Plaintiff the next day (Ex. 2, ¶¶ 12, 13, att. B). At the point in time when Riley hooked that trailer to his tractor, the load was consigned entirely to the possession and control of West Northwest and its drivers under the carriage contract between Pinnacle and West Northwest, and the trailer would remain in West Northwest's possession and control until it was unloaded the next day at Millard Refrigerated Services in Georgia (Ex. 2, ¶ 17).

The trailer contained frozen food product that had been palletized, shrink-wrapped, and loaded by Pinnacle's employees (Ex. 2, ¶ 18). There were 28 pallets in the load (Ex. 2, ¶ 19). Pinnacle's standard procedure was to apply the load-bracing bars if they were in working order

unless the load configuration prevented it (Ex. 2, ¶ 19).  In any event, for the purposes of this motion, Plaintiff's version of the manner in which the load and the load-bracing bars were configured in the trailer will be assumed.

Plaintiff testified at deposition that this particular load ended approximately five inches from the trailer doors (Ex. 1, p. 57).  She testified the two load-bracing bars were unused and had been originally placed and engaged (before the rearmost one fell) in a vertical position to the side of the load against the wall on the driver's side, one behind the other, with the ends pressed against L-shaped metal plates that ran the length of the trailer to reinforce the joints between the ceiling and the wall and between the floor and the wall (Ex. 1, pp. 67-71).  The bars had been essentially stored unused in this position.  There is no evidence Pinnacle's loaders placed the bars in this position, however and it is possible the bars were placed in that position by employees of West Northwest prior to delivering the trailer to Pinnacle and were left in that position by Pinnacle's loaders when they deemed the bars unneeded.  It was Pinnacle's standard operating procedure to place unused load-bracing bars on the floor of a trailer (Ex. 2, ¶ 10).  In any event, according to Plaintiff, and as described in more detail below, the rearmost of these load-bracing bars fell from its vertical position and struck her right hand when she opened the driver-side trailer door on March 17, 2011, at Millard Refrigerated Services in McDonough, Georgia.

### The events of March 17, 2011.

On the morning of March 17, 2011, Plaintiff hooked the same trailer that Riley had pulled to Mulberry from Fayetteville the previous day and hauled it approximately 700 miles from Mulberry to Millard Refrigerated Services in McDonough, Georgia (Ex. 1, pp. 31, 96-97).  She traveled primarily on interstate highways through Mississippi and Alabama, encountering

several rough spots in Arkansas and around Birmingham (Ex. 1, pp. 96-98).   She arrived at Millard Refrigerated Services at approximately 8:00 p.m. the same day after driving for approximately ten hours (Ex. 1, pp. 31, 50).   It was dark when she arrived but she testified the lighting in Millard's dock yard was "very good" (Ex. 1, p. 51).   She backed the trailer to within fifteen feet of the loading dock, set the brakes, and walked around to the rear of the trailer (Ex. 1, pp. 51-54).   She then removed the seal on the doors, and opened the passenger-side trailer door first (Id.).   That door opened without incident and she pinned it back against the side of the trailer (Ex. 1, pp. 54, 56-58).   She then looked inside (Ex. 1, p. 58).   Clouds of condensation had formed inside the trailer but she observed the load was not in an unusual position and ended about five inches from the doors (Ex. 1, pp. 57, 61).   She did not observe any load-bracing bars in place on the load, nor did she observe any bars behind the still closed driver-side door (Ex. 1, pp. 61-62). She testified she "very seldom" observed load-bracing bars in use on Pinnacle's loads, and she testified Pinnacle's loaders typically left unused bars on the floor of the trailer (Ex. 1, pp. 61-62; Ex. 2, ¶ 10).   She did not observe any bars at all, however, on the floor or otherwise, when she opened the passenger-side door:

> Q.    But did you look down after you opened the right-hand door?  Did you look in that space between the left-hand door and the deal –
>
> A.    Yes, sir.
>
> Q.    -- to see if there were load locks?
>
> A.    Yes, what I could see.  Yes, I did.
>
> Q.    Okay.  So you saw no load locks.
>
> A.    Saw nothing whatsoever.

(Ex. 1, p. 68; also, Ex. 1, pp. 61-62).   She acknowledged at deposition this logically meant the load-bracing bars were on the opposite side of the trailer from where she was looking in from the

passenger-side opening, but she did not testify she climbed into the trailer, or stood on any part of the trailer, to look further into the cargo compartment to ascertain the position or the state of the bars (Ex. 1, p. 73).  Clearly, if the rearmost vertical load-bracing bar had come loose and fallen rearward – as it seems that it must have in order to fall out of the trailer when Plaintiff opened the driver-side door – then the top of the bar would had fallen against the closed driver-side door, so a slightly closer inspection of the situation surely would have revealed the problem.

After her cursory look inside the passenger-side opening, Plaintiff opened the driver-side door.  She testified as follows concerning her hand-position while opening that door:

Q.      So you're – you have your right hand on the – on the edge of the door?

A.      Left hand is on the outside of the door, *right hand is on the inside of the door.*

Q.      Pulling it?

A.      Bringing it around to open.

(Ex. 1, p. 64).  She similarly testified elsewhere that her right hand was "on the inside of the door, pushing it out" (Ex. 1, pp. 99-100).  She conceded she could have used the outside door latch as a handhold to pull the door open, but she did not, claiming it was awkward (Ex. 1, p. 99).  Clearly, by leaving her right hand on the inside of the door she exposed it to injury by objects falling from the trailer as she opened the door.  That is precisely what happened.  She testified the injury occurred as she was stepping around and pulling the driver-side door after her:

> That last step before I stepped around the side, something – a note – felt something coming at me as I was going around.  So I threw my hand up like this (indicating).  I still got ahold of the door.  I'm still walking.  Right as I get to the end of the trailer is when something seemed like it was coming at me.
>
> As I'm walking – as I get right here, the hinges pop.  There's a pop.  Boom.  Because the hinges – yeah, they pop as I – and as they pop, something comes at me out of the dark, out of the fog.  I throw my hand up like this (indicating).  The load lock hit me right here (indicating).  Knocked my hand into my face and knocked me back.  I did not fall down. It staggered me a step or two, and the load lock was on the ground in front of me.

(Ex. 1, pp. 64-65).  Plaintiff testified the load-bracing bar struck and severely injured the little finger of her right hand (Ex. 1, pp. 64-66).  She stated the bar was in its extended, "engaged" position when it fell, indicating to her it had been placed and engaged vertically in the trailer and fell from that position (Ex. 1, p. 70).  She testified a bar remained in the trailer that was still fixed in a vertical position (Ex. 1, pp. 67, 69, 74).

Plaintiff testified she was well aware at the time that load-bracing bars were sometimes placed vertically in this manner in trailers she pulled for Pinnacle (Ex. 1, pp. 46, 81-82, 110-112).  And – most importantly – she testified she was well aware those bars frequently came loose and fell in transit:

> In my experience, any time that someone has engaged two load locks in a short area, say less than a foot apart, one is always tighter than the other.  They – they – you can only do one at a time.  So typically, the second one, you might be a little – might stretch it a little bit more and they – in my experience, a lot of times, most times, when you get to a point and you open trailer doors because of the road, the contours, just geography, trailers shifting and moving, one will always be loose, especially if they are not brand new, because of the wear and tear and them getting loose, in my experience.

(Ex. 1, p. 71).  In fact, Plaintiff testified that "every time" there were two load-bracing bars placed close together in a vertical position, one of them fell, even after a relatively short trip (Ex. 1, p. 82).  This was a natural result of the jarring and stresses inherent in cross-country driving:

> Q.     So given that, what caused one of them to break loose?  What's your impression?  Because maybe one of them is not as strong as the other?  Is that the point you're making?
>
> A.     And just the movement of the trailer up and – just across the geography, across railroad tracks.  You cross several railroad tracks in and out of there to get to the plant.  Trailers give.  They're not rigid, as you've seen driving down the road.

(Ex. 1, pp. 74-75, 81).  She testified that even load-bracing bars placed horizontally commonly fell in transit (Ex. 1, pp. 86-87, 91, 112).  She does not, however, know precisely when the vertically placed bar came loose on March 16 or 17, 2011, nor does she know the mechanism by

which it came loose, nor did she see the bar at any time prior to the moment it was falling and struck her hand (Ex. 1, pp. 76-78).

## II.
## The Law

The applicable common law of negligence as between shippers and carriers is stated in United States v. Savage Truck Line, Inc., 209 F.2d 442 (4th Cir. 1953), which has become the seminal decision in this area of the law.  Savage arose out of an accident in which airplane engines being hauled on a tractor-trailer came loose from their securement devices on a curve and killed an oncoming driver.  The engines, packed in cylinders, had been loaded by employees of the United States government who had not sufficiently fastened the cylinders to the trailer. The estate of the deceased driver sued Savage Truck Line and the United States, each of which filed a complaint in indemnity against the other.  At trial, the district judge found the United States (as the loading shipper) had been negligent and entered judgment against it in favor of the estate in the same amount as a jury had found Savage (as the carrier) liable to the driver's estate. The United States appealed to the Fourth Circuit, arguing it was entitled to indemnity from Savage, not the other way around.  In analyzing the respective duties and liabilities between shippers and carriers, the Fourth Circuit outlined the following foundational principles:

> The decision of the questions raised by these appeals as to the respective liabilities of the United States and of Savage for the damages occasioned by each to the property of the other turns on the rights and liabilities inherent in the carrier-shipper relationship between them in the interstate transaction upon which they were engaged. These rights and liabilities are fixed by the Acts of Congress, the terms of the contract contained in the bill of lading, and the rules of the common law which are recognized by the federal courts.

> *     *     *

> The common law liability of a common carrier is that of an insurer for loss of [sic] damage of goods in transit with certain well defined exceptions.  The federal statutes and decisions are in accord. It is provided by 49 U.S.C.A. § 20(11) which is made applicable to carriers by motor vehicle by 49 U.S.C.A. § 319 that common carriers shall issue a bill

of lading for property received for transportation in interstate commerce and shall be liable to the holder for any loss, damage or injury to the property caused by the carrier; and that no contract shall exempt the carrier from the liability imposed.

&ast;    &ast;    &ast;

The exceptions to the rule of absolute liability are those which relate to losses arising from acts of God, acts of the public enemy, the inherent nature of the goods, and acts of the shipper. It is contended in this case that the carrier falls within the last mentioned exception because of the negligence of the United States in loading the engines and fastening them insecurely to the floor of the truck.

&ast;    &ast;    &ast;

It has been held in sweeping terms that the duty rests upon the carrier to see that the packing of goods received by it for transportation is such as to secure their safety

&ast;    &ast;    &ast;

The primary duty as to the safe loading of property is therefore upon the carrier. <u>When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.</u>

<u>Id.</u>, p. 445 (emphasis added). The district judge had found that agents of the United States negligently loaded the cylinders by failing to adequately secure them, but the judge also found Savage's driver was negligent. From this,

[i]t follows, applying the rule above set out that Savage is not entitled to recover from the United States for damages to the Savage truck, but that the United States is entitled to recover from Savage for the damage to its airplane engines and containers.

&ast;    &ast;    &ast;

In the present case a combination of factors clearly shows that the principal fault lay with the carrier. First of all, there is the important circumstance that the carrier owed the contractual duty to the shipper to carry the goods safely and was not relieved from this duty by the negligent loading of the shipper[.]

Id., p. 446.   Thus the United States – as the loading shipper – was not liable for its own negligence because the securement defect caused by its agents was not latent and could have been discovered by the carrier through reasonable inspection.

The rule in Savage has been applied in circumstances similar to those in the present case to find that loading shippers were not liable for injuries caused by loading defects that were not latent and not concealed from observation by the carrier.  The Eighth Circuit did precisely that in Vargo-Schaper v. Weyerhauser Company, 619 F.3d 845 (8th Cir. 2010).  In that case, Weyerhauser – the shipper – had loaded bundles of flattened cardboard boxes on pallets in a trailer that Schaper was hauling as an employee of a third-party contract carrier.  The cardboard bundles were not secured to their pallets.  When Schaper arrived at his destination and opened the trailer, he was struck and killed by a falling bundle.  His wife sued Weyerhauser for negligent loading of the trailer, but the district court granted summary judgment to Weyerhauser under the rule in Savage on the grounds the wife did not present evidence of a latent loading defect that shifted liability to Weyerhauser as the loading shipper.  The Eighth Circuit wrote:

> The Savage rule therefore imposes liability on carriers even if the shippers negligently loaded the cargo, except where the shippers' "negligence was undiscoverable through a reasonable safety inspection."  …  The policy behind the Savage rule reflects the practice and understanding in the trucking industry as to carriers having final responsibility for the loads they haul.
>
> *     *     *
>
> Weyerhaeuser had a duty of care to Schaper to prevent latent loading defects under the Savage rule. Weyerhaeuser did not have a duty however, to prevent or correct any open or obvious loading defect. Accordingly, the burden is on Vargo-Schaper to present evidence of a latent defect to overcome summary judgment.

Id., pp.  848-849.  In analyzing whether a latent defect existed in the loading of the cardboard bundles that was not discoverable upon inspection, the Eighth Circuit noted:

> a primary factor viewed by many courts is the amount of experience possessed by the driver. … It stands to reason drivers with more experience are more capable of detecting loading defects than those without experience.

Id., p. 849.  The second principle factor in this analysis is "whether the shipper provided any assurances regarding the safety of the load to the driver, which detracts from the open and obvious nature of the defect."  Id.  The alleged loading defect in Weyerhauser was "crowning" at the top of the cardboard bundles created when the flattened boxes were tightly strapped together. This crowning could make stacks of bundles unstable.  However, the Eighth Circuit held that since Schaper had "years of experience" driving for this employer and since there was no evidence Weyerhauser gave any assurances of load safety, the district court was correct in finding on summary judgment that the crowning was not a latent loading defect since it would have been apparent upon reasonable inspection to a driver of Schaper's experience.

No Arkansas appellate court has adopted, or considered adopting, the rule in Savage as the law of Arkansas.  However, in Weyerhauser – a diversity case arising in Minnesota – the Eighth Circuit described the rule in Savage as "the prevailing law followed by most jurisdictions for the duties of shippers and common carriers" and it proceeded to analyze the facts under the rule in Savage without explicitly considering whether the Minnesota courts would adopt it.  Id., p. 848.  In Aragon v. Wal-Mart Stores East, LP, 753 F.3d 807 (8th Cir. 2013) – also a diversity case, but this time in Missouri – the Eighth Circuit took a slightly different approach by explicitly "assuming, without deciding, that the Supreme Court of Missouri would adopt the Savage rule."  Id., p. 810.  In that case, Aragon, a driver for J.B. Hunt, was injured when shrink-wrapped pallets of reusable plastic containers fell from the back of a trailer loaded by IFCO. When he initially hooked the trailer, Aragon opened the passenger-side door and viewed the load but did not open the driver-side door.  He did not observe any form of load lock in place.  When

he arrived at his destination and opened the driver-side door, pallets fell and injured him.  He sued Wal-Mart as the shipper and IFCO as the contract loader for Wal-Mart.  The district court granted both defendants summary judgment under the rule in <u>Savage</u> and Aragon appealed.  The Eighth Circuit affirmed dismissal on the basis that a latent loading defect was not proven to have existed, again noting that the two primary factors in the analysis are the experience of the driver and "the presence or absence of any assurances by the shipper regarding the security of the load." <u>Id.</u>, p. 810.  The court noted Aragon had (like the Plaintiff here) an opportunity to view and inspect the load from the passenger-side door opening prior to opening the driver-side door, and no assurances of load security had been made to him.  Therefore "no reasonable jury could have found that the absence of securing devices was anything other than open and obvious to Aragon." <u>Id.</u>, pp. 811-812.

Following the lead of the Eighth Circuit, this Court should apply the rule in <u>Savage</u> to analyze the circumstances of this case to determine whether Pinnacle – as the loading shipper – is liable to Plaintiff for her injuries due to a latent loading defect not discoverable by her through reasonable inspection.  Plaintiff has the burden of proof on this issue.  <u>Weyerhauser</u>, *supra*, p. 849 ("the burden is on [the plaintiff] to present evidence of a latent defect to overcome summary judgment").  Pinnacle asserts Plaintiff cannot meet this burden of proof, so no reasonable jury could find she was injured by a latent load defect caused by Pinnacle without resorting to impermissible speculation.  Therefore, Pinnacle is not liable to Plaintiff for her injuries as a matter of law regardless of whether its employees were negligent in the loading of the trailer or in the placement of the load-bracing bars.

**III.**
**Plaintiff cannot produce evidence from which a reasonable jury could find Pinnacle**
**created a latent loading defect not discoverable through reasonable inspection.**

The various relationships between Plaintiff, Pinnacle, and West Northwest are undisputed.  Pinnacle was the owner and shipper of the goods in the trailer within the meaning of the rule in Savage, and its employees loaded the trailer at its Fayetteville plant (Ex. 2, ¶¶ 4, 7, 12, 18, att. B).  West Northwest was the carrier of the goods in the trailer, and was under contract with Pinnacle to carry its goods (Ex. 2, ¶ 5, att. A).  The first page of the carriage contract expressly defines Pinnacle as the shipper and West Northwest as the carrier in their business relationship (Id.).  Under the terms of that contract, West Northwest was liable Pinnacle "without limitation" for loss or damage to shipped product, preserving the usual common law liability rule mentioned in Savage that the carrier acts as an insurer of the goods carried (Ex. 2, ¶ 5, att. A, ¶ 9.1.1).  Savage, *supra*, p. 445.  By extension, Plaintiff – as the driver agent of West Northwest – was also the carrier for the purposes of the rule in Savage, as indicated by the Eighth Circuit cases discussed above.  The relationships between the parties therefore invoke the application of the rule in Savage, so Pinnacle may only be liable to Plaintiff for negligent loading if it left "defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier.," i.e., Plaintiff herself  Savage, *supra*, p. 445.  Crucially, it is Plaintiff who carries the burden of proof on this issue and who must produce evidence from which a reasonable jury could find the alleged loading defect was latent and concealed from her reasonable inspection.  Weyerhauser, *supra*, p. 849 ("the burden is on [the plaintiff] to present evidence of a latent defect to overcome summary judgment").  Pinnacle contends Plaintiff cannot meet this burden of proof as a matter of law and therefore her negligence claim must fail.

As the Eighth Circuit has noted, two primary factors play into the analysis of whether a loading defect is latent. The first is the experience of the driver. The undisputed facts show Plaintiff was a highly experienced driver at the time her injury occurred, having driven over-the-road for more than twenty years (Ex. 1, pp. 25-30). More to the point, by March 2011 she had hauled over 500 trailers of Pinnacle-loaded product from Mulberry to Millard Refrigerated Services, over a period of several years and typically twice a week (Ex. 1, pp. 30, 35, 50). She was highly experienced with the procedures and habits of Pinnacle's Fayetteville loaders and the peculiarities of Pinnacle-loaded trailers, a fact which emerged clearly in her deposition testimony. She testified she often opened Pinnacle-loaded trailers to find unused load-bracing bars locked in place in vertical positions and she testified that nearly always at least one of those bars had *fallen in transit* from its original vertical position (Ex. 1, pp. 46, 73, 80-83, 110-112). In fact, she testified that always or almost always at least one of the load-bracing bars fell during transit regardless of whether it had been originally placed horizontally or vertically (Ex. 1, pp. 80-83, 91, 112). Plaintiff was exquisitely aware that fallen load-bracing bars were a potential hazard in Pinnacle-loaded trailers. Therefore, as a general matter, dislodged load-bracing bars could not have been a latent or undiscoverable defect with respect to Plaintiff and her pre-existing knowledge of that particular hazard. She cannot carry her burden of proof by claiming she was unaware of the possibility of a falling load-bracing bar.

Plaintiff did, however, *act* as if she was unaware of the danger of dislodged bars, which was itself negligent. She testified she opened the passenger-side trailer door and peered inside, seeing only clouds of condensation and no load-bracing bars whatsoever (Ex. 1, pp. 61-62, 70, 77). She testified she sometimes found unused load bars on the floor of trailers where they had been placed by Pinnacle's loaders or where they had come to rest after falling from their original

horizontal or vertical engaged positions (Ex. 1, p. 62).  If she did not see any load-bracing bars *at all* when she opened the passenger-side door, then her prior experience should have prompted her to ascertain the location and positioning of the bars before opening the driver-side door.  But she failed to do that.  If the bar that fell on her as she opened the driver-side door had fallen toward the rear of the trailer from a vertical position, then it must have been leaning against the inside of the driver-side door in some manner, a condition that was not obviously hidden from her inspection.  It would seem she had only to look across and see it.  She claims she did not see it, however:

> Q.      … As you open the door, if it's leaning up against the door, then logically it very well could fall out.
>
> A.      Yes, sir.
>
> Q.      I can – that makes sense to me.
>
> A.      Yes, sir.
>
> Q.      *My question to you is, when you looked in there, is it your testimony that you – based on what you could see, you did not see it leaning against the door.*
>
> A.      *That is correct.*  I could not see – any kind of object at all up against anywhere.

(Ex. 1, p. 77).  Plaintiff claims clouds of condensation swirled in the trailer, but rather than being an excuse this should have been a reason for her to make a more careful inspection since condensation could be expected to make it somewhat more difficult to make a good inspection.  In any event, she testified the condensation did not actually impede her ability to see into the trailer in any significant way.  And there is no evidence anything else impeded her ability to make the type of inspection that should have been prompted by her then-existing knowledge that there may be vertical load-bracing bars in the trailer, and if there are, one of them has almost certainly fallen because they always do (Ex. 1, pp. 79-80).  So not only did Plaintiff have prior

knowledge and experience of the very danger that ultimately injured her, she failed to conduct the inspection that knowledge and experience reasonably demanded.  Therefore this first factor of her driving experience weighs strongly against her and does nothing to assist her in carrying her burden of proving a latent loading defect.

Plaintiff claims there was a possibility that 'popping' of the driver-side door hinges as she opened that door could have jarred the load-bracing bar loose (Ex. 1, pp. 67-68, 77-78).  She apparently makes this assertion to create doubt as to whether the bar was in fact observably leaning against the driver-side door when she looked into the trailer from the passenger-side. This suggestion is unavailing to her for two reasons.  First, it is purely speculative.  Plaintiff clearly testified she first saw the bar only as it was falling toward her (Ex. 1, pp. 68-70, 74-77). Since she did not see the bar upright in the trailer before it fell, she cannot prove – and no reasonable jury could find without speculating – that the bar was still standing upright and not leaning against the driver-side door when she peered into the trailer from the passenger-side. Second, the external agency of "popping" door hinges causing an otherwise engaged load-bracing bar to come loose does not show a loading defect, latent or not.  A hypothetical chain of events set in motion by the action of door hinges was not any more the fault of Pinnacle's loaders than the road conditions that frequently caused otherwise properly placed load-bracing bars to fall in transit.  Further, there is no evidence there was anything inherently wrong with the general concept of placing load-bracing bars vertically since, as Plaintiff testified, those bars were frequently placed and engaged in a vertical position when used for their normal purpose of cargo securement (Ex. 1, pp. 46, 110, 112).  Still further, Plaintiff could not assert the action of door hinges on load-bracing bars was latent and undiscoverable since the very fact she testified it could occur indicates she was aware of the possibility.  Plaintiff was simply too experienced to

17

avoid the consequences of her own negligent omissions, and her speculation concerning the door hinges does nothing to help her carry her burden of proof.

The second primary factor in the analysis of whether a loading defect was latent is the presence or absence of any assurances made to Plaintiff or to West Northwest concerning the security of the load or the load-bracing bars themselves.  There is no evidence any agent of Pinnacle made any representation or assurance to Plaintiff or to West Northwest that the load or the load-bracing bars were secure.  In fact, it would be the height of folly for Pinnacle to guarantee the security of the placement of *any* load-bracing bar since, as Plaintiff testified, it was very common for that style of bar to come loose in transit, since they are held in place only by tension and friction.  Everyone involved, including Plaintiff, was well aware these bars commonly came loose, and it was incumbent on Plaintiff to insure she was not injured by a loose bar.  This second analytical factor also works against Plaintiff and does nothing to assist her in proving she was injured by a latent loading defect caused by Pinnacle.

Additionally, there is no evidence a latent defect existed in the load-bracing bar itself.  Plaintiff testified the bar that fell was simply placed back in the trailer and never inspected by anyone, so the jury would be required to speculate wildly to find the bar itself was defective (Ex. 1, p. 90).  In any event, it is undisputed the bar was the property of West Northwest and provided by West Northwest with the trailer, so Pinnacle would not have been responsible for any latent defect in the bar even if one were shown to have existed (Ex. 1, p. 85; Ex. 2, ¶ 6).

 Overall, Plaintiff's effort to prove a latent loading defect is stymied by her inability to testify concerning the condition and placement of the bar prior to the incident, and by her resulting inability to testify concerning the exact mechanism that caused the bar to fall.  She did not ever see the bar in the trailer, only seeing it for the first time at the moment it fell and struck

her hand.  In fact, *all* she can prove by a preponderance of her testimonial evidence is that the bar fell from the trailer and struck her hand.  Nothing more.  Recall that under the rule in Savage she carries the burden of proving by a preponderance of the evidence that her injuries were caused by a latent loading defect not discoverable by her reasonable inspection.  Since she has no evidence from which a reasonable jury could determine *why* the bar fell without speculating, it follows she also offers no possible basis from which the jury could find without still more speculation that the bar fell specifically as a result of a latent defect caused by Pinnacle's loaders.  In that respect, this case is like the facts considered by the Arkansas Supreme Court in Schubert v. Target Stores, Inc., 2010 Ark. 466, 369 S.W.3d 717 (2010).  Schubert was a driver employee of J.B. Hunt, which had contracted with Target to provide transportation services for its goods.  Schubert hooked a trailer at a Target warehouse in Maumelle, Arkansas, that had been loaded with bales of cardboard boxes by Target's employees.  He then pulled the trailer to an International Paper facility in Louisiana, where he opened the trailer doors and suffered injuries when a 1,000-pound bale of cardboard fell him.  He testified "he did not see the bale while it was in the trailer and that the first time he saw it was when it was on the ground on top of him."  2010 Ark. 466, p. 5; 369 S.W.3d at 720.  Given this lack of evidence concerning the exact cause and mechanism of the accident, the court held no negligence was proven, since as the Court noted "[t]he fact that an accident occurred with nothing more is not evidence of negligence on the part of anyone."  2010 Ark. 466, p. 4; 369 S.W.3d at 719.  That principle is equally applicable here.

Plaintiff is plagued by a similar lack of evidence with respect to the question of *who* placed the load-bracing bars in their allegedly vertical position in the trailer.  She simply does not know.  It was the standard operating procedure of Pinnacle's loaders to place unused load-bracing bars on the floor of the trailer (Ex. 2, ¶ 10).  Plaintiff agrees this was the case:

> A.   … [V]ery seldom did you ever open a Pinnacle trailer that actually had a load lock in the stabilizing position.  They were usually on the floor, leaned down across.
>
> Q.   Well, were they engaged?  Are you saying that most of the time when you opened the Pinnacle truck that the load locks weren't engaged?
>
> A.   That's absolutely what I'm saying.
>
> Q.   So they're just laying around.
>
> A.   Yes, sir.  Wherever the loader throws them.

(Ex. 1, p. 62).  So not only can Plaintiff not produce any testimony or evidence from which the jury could find Pinnacle's loaders placed the bar in its allegedly vertical position, but her own deposition testimony undercuts her proof on that issue.   There are certainly alternative explanations that appear just as likely in the absence of evidence definitively pointing one way or the other.   It is possible an employee of West Northwest placed the bars vertically and they were simply left in place by Pinnacle's loaders when they were deemed unnecessary.   Joe Layman, who has been second shift Shipping and Receiving Leader at Pinnacle's Fayetteville plant since 2000, testified this sometimes occurred:

> A.   We don't – we don't require load locks in the trailers.  Sometime they have them.  Sometimes we put them on if they have them on the truck, you know.  I've seen 20 load locks in a truck before.
>
> And whenever they have them, it's hard to get them all back on the trailer with the stuff that's already on the trailer that we're shipping out.  But like when they have multiple load locks – like a lot of times, the carriers will have them standing up in the back.
>
> Q.   Before you load the trailer?
>
> A.   Before we load the trailer.  And if they're like that and we can get the product on it without moving them, we don't even touch them.  We just leave them right where they're at.

*     *     *

> Q. So do you know anything about if load locks were placed side-by-side vertically on the same wall of one of these trailer?
>
> A. We don't put them vertically on the trailers if we put them back in.  If we don't put them horizontally across the load, we put them in the floor.

(Ex. 3, pp. 5, 9-10, 12-13, 15).  Billie Cornelison, who has been a Yard Dog Operator at

Pinnacle's Fayetteville plant since 1996, testified similarly:

> Q. Have you ever secured a load lock into place on like the vertical side of a trailer?
>
> A. Sometimes there may be five or six load locks in there in the back of the trailer, and they're stood up on the side.
>
> Q. And when you say "stood up," are they secured?  Are they ratcheted into place?
>
> A. They're somewhat, yeah.
>
>                  *      *      *
>
> A. Sometimes if they're secured up and down on the ends where it doesn't bother our loading, we just leave them sitting there.
>
> Q. Okay.  If you do have to take them out once the trailer gets loaded full of the pallets of product, what do you do with them then?
>
> A. Well, it's according to who closes the door, who is there at the time that they finish loading. Now, sometimes the forklift drivers put a load lock crossways.  But most of the time, they lay them down in the floor and just leave them there.

(Ex. 4, pp. 5, 8-9).  It is even possible employees of Millard Refrigerated Services placed the

bars vertically after they unloaded the trailer during a prior haul from Fayetteville to

McDonough, after which either the trailer was not opened again until redelivery to Pinnacle or

West Northwest's employees left the bars in place upon the trailer's return from McDonough.

So even if it were assumed the alleged vertical placement of the load-bracing bars was a

negligent latent defect undiscoverable by reasonable inspection, there is no evidence from which

a reasonable jury could find without speculation that agents of Pinnacle placed the bars and

caused the alleged defect.

On the evidence presented by Plaintiff, the precise reason why the load-bracing bar fell, and whether it fell as a result of a latent loading defect, are both unknown and unknowable. Plaintiff also cannot produce evidence from which the jury could find it was Pinnacle that actually placed the bar that fell from its alleged vertical position. This wholesale lack of evidence concerning causation is fatal to Plaintiff's negligence claim since she carries the burden of proving the bar fell due to a latent loading defect caused by Pinnacle. No reasonable jury could find in her favor without resorting to impermissible speculation; therefore, her negligence claim fails as a matter of law and should be dismissed.

### III.
### Plaintiff cannot prove negligence by res ipsa loquitur.

In the alternative, Plaintiff seeks to prove her negligence claim through the doctrine of *res ipsa loquitor*. Since the Court is sitting in diversity, Arkansas law controls. There are four elements to a *res ipsa loquitor* theory in Arkansas law:

(1)     the defendant owes a duty to the plaintiff to use due care;

(2)     the accident is caused by the thing or instrumentality under the control of the defendant;

(3)     the accident that caused the injury is one that, in the ordinary course of things, would not occur if those having control and management of the instrumentality used proper care; and

(4)     there is absence of evidence to the contrary.

Barker v. Clark, 343 Ark. 8, 13-14, 33 S.W.3d 476, 480 (Ark. 2000). This doctrine is not an independent basis for liability but is rather a non-standard mode of proving liability for negligence. Kirkpatrick v. American Railway Exp. Co., 177 Ark. 334, 6 S.W.2d 524, 526 (1928); Helton v. Avrio Group Surveillance Solutions, Inc., 5 F.Supp.3d 386, 402 (W.D.N.Y.

2014)("*res ipsa loquitor* is not a separate theory of liability, but, rather, amounts to nothing more than a common sense application of the probative value of circumstantial evidence").

A *res ipsa loquitor* theory does not help Plaintiff in this case, however, since it does not escape the fundamental problem that dooms her standard negligence theory, which is that even if Pinnacle's loaders *were* negligent – whether under *res ipsa loquitor* or another theory – Pinnacle cannot be found liable for that negligence unless Plaintiff can prove it caused a latent loading defect by which she was injured.  But she cannot prove such a defect as a matter of law for all the reasons discussed above.  Put another way, *res ipsa loquitor* is simply another way of proving Pinnacle's negligence, but Pinnacle's negligence remains irrelevant under *any* theory unless and until Plaintiff clears the evidentiary hurdle of showing there was a latent loading defect that shifted liability to Pinnacle.  But she cannot clear that hurdle as a matter of law for lack of evidence, so *res ipsa loquitor* is ultimately unavailing to her.

Even assuming *res ipsa loquitor* were available to Plaintiff, that line of attack would fail as a matter of law in any event on the second element of control.  Control is interpreted strictly by the Arkansas courts:

> To make certain that the injury has not been caused by somebody else, through some intervening negligence, it is ordinarily required that the instrumentality causing injury have been in defendant's exclusive possession and control up to the time of the plaintiff's injury.

> \*       \*       \*

> In other words, this court has consistently held that the element of exclusive control is essential to proving a case under a theory of res ipsa loquitur

343 Ark. at 14-15; 33 S.W.3d at 481.  The instrumentality that caused Plaintiff's injuries was a load-bracing bar that fell from a trailer in McDonough, Georgia, on March 17, 2011.  The trailer containing this load-bracing bar indisputably left the exclusive possession and control of

Pinnacle on March 16, 2011, when West Northwest driver Bob Riley hooked the trailer and pulled it to West Northwest's yard in Mulberry.  Plaintiff herself then took exclusive possession and control of the trailer and the load-bracing bar within on March 17, 2011, when she hauled them ten hours and 700 miles from Arkansas to Georgia.  Plaintiff cannot show Pinnacle had exclusive possession and control over the load-bracing bar up to the time of her injury because that was indisputably not the case.  Further, Plaintiff cannot produce any evidence showing an agent of Pinnacle even placed the load-bracing bar in the alleged vertical position from which it fell.  Therefore Plaintiff cannot as a matter of law prove Pinnacle was negligent by means of the doctrine of *res ipsa loquitor*.

The Arkansas Supreme Court reached the same conclusion on similar facts in the <u>Schubert</u> case discussed in the previous section.  Again, in that case Schubert was a driver for J.B. Hunt, who hooked a trailer at a Target warehouse in Maumelle, Arkansas, that had been loaded with bales of cardboard boxes by Target employees.  He pulled the trailer to Louisiana, where he opened the trailer doors and was injured by a falling bale.  He did not see the bale until it was on top of him.  He advanced a *res ipsa loquitor* theory in support of his negligence claim against Target, arguing the bale would not have fallen in the ordinary course of things but for the negligence of Target's loaders.  However, the Arkansas Supreme Court upheld a directed verdict denying Schubert's *res ipsa loquitor* theory:

> Here, we cannot say that the doctrine of res ipsa loquitur applies. Although Schubert asserts that the trailer was in the exclusive control of Target, as evidenced by the tamper seal placed on the trailer, this, in and of itself, is not enough to establish that res ipsa loquitur applies. Schubert simply did not put forth evidence that would have allowed the jury to eliminate all causes of the accident other than improper loading by Target employees. …  In fact, Schubert admitted that there appeared to be no problem with the load during the trip to Louisiana and that the trailer pulled straight as it should have. He also admitted that it is possible for a load to shift during transit, even with normal driving conditions.

2010 Ark. 466, pp. 7-8; 369 S.W.3d at 721.  Likewise, Plaintiff admitted that load-bracing bars commonly fell simply as a result of the strains and forces inherent in long distance over-the-road travel.  Those forces, and Plaintiff's own control over the trailer and the bar inside immediately prior to her injury, prevent the application of *res ipsa loquitor* and, like Plaintiff's standard negligence theory, it fails as a matter of law and should be dismissed.

Respectfully submitted,

PINNACLE FOODS GROUP LLC,
Defendant.


By:___/s/ Michael R. Jones_____

Michael R. Jones
Christopher F. Woomer
GILKER AND JONES, A Professional
Association
9222 North Highway 71
Mountainburg, Arkansas   72946
Telephone:     (479) 369-4294
Facsimile:     (479) 369-2032

ATTORNEYS FOR DEFENDANT.


CERTIFICATE OF SERVICE

I, Michael R. Jones, hereby certify that on May 21, 2015, I filed the foregoing DEFENDANT'S MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT with the Court's CM/ECF system, which will serve electronic notice of filing upon the following CM/ECF participant:

Adrienne Kincaid Murphy
Martin Law Firm
P.O. Box 3597
Fayetteville, Arkansas   72702

____/s/ Michael R. Jones_____
Michael R. Jones